**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CAMPAIGN LEGAL CENTER

                Plaintiff,

                v.

IOWA VALUES

                Defendant

No. 1:21-cv-00389-RCL

Judge Royce C. Lamberth

**IOWA VALUES' REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT**



RECEIVED

FEB 10 2023

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS..................................................................................................i

INTRODUCTION ........................................................................................................1

ARGUMENT ...............................................................................................................2

I.   This Case Should Be Dismissed for Lack of Standing and/or Mootness ..........................2

   A.  The Question of Jurisdiction Is Properly Before the Court .........................................2

   B.  CLC Lacks Standing to Maintain This Suit ..............................................................3

   C.  Dismissal Is Appropriate Under the Prudential Mootness Doctrine.............................5

II.  The FEC Retained Jurisdiction Over MUR No. 7674 ....................................................7

   A.  The Statute Does Not Divest the FEC of Jurisdiction for "Failure to Act" on a Matter  7

      1.  *Brock* Weighs Against Reading FECA as Divesting the FEC of Jurisdiction........8

      2.  The INA Cases Cited by CLC Do Not Support Divesting the FEC of Jurisdiction  11

   B.  CLC's Two Alternative Arguments Regarding Jurisdiction Fail ................................15

      1.  Jurisdiction When the FEC Failed to Conform to the Court's Order. .................15

      2.  Jurisdiction After This Case Began. ............................................................16

III. CLC's Argument that There Was No FEC Action Turns FEC Procedure on its Head and Demonstrates Why the Court *Should* End this Case........................................................16

   A.  The Deadlocked Reason-to-Believe Vote Constituted FEC "Action" .......................16

   B.  CLC Would Allow the Refusal to Close a File to Impose a Four-Vote Requirement to End a Matter in Contravention of the Clear Text of the Statute ................................19

   C.  The Timing of the FEC's Action Was Not "Unreasonable" Under *TRAC* and *Common Cause*.............................................................................................................22

CONCLUSION ..........................................................................................................25

## INTRODUCTION

Iowa Values' Motion for Summary Judgment (ECF No. 63, the "Motion") presents a straightforward question for the Court to decide: does an FEC decision to close the file in a Matter Under Review after a private cause of action has been initiated render that case moot? Or to put it in the opposite terms, does the initiation of the private cause of action after the FEC has (allegedly) failed to act on a matter divest the agency of jurisdiction to decide the MUR? Iowa Values submits that unless the Court wants to encourage Commissioners who lose a deadlocked vote on the merits to block timely judicial review, it should answer the first question in the affirmative and the second question in the negative.

As explained in the Motion, the Court should dismiss CLC's suit for lack of standing and/or mootness. Nothing in CLC's Opposition moves the needle in favor of prolonging this case. The FEC has acted on the merits of CLC's complaint, failing to find reason to believe that Iowa Values violated FECA. Indeed, it did so before this private suit commenced. Any decision this Court makes on the merits would either be inconsistent with or duplicative of the FEC's decision. In its effort to keep its case alive, CLC urges the Court to ignore the FEC's decision because the FEC, according to CLC, lost jurisdiction over the matter by failing to act sooner. In fact, CLC would have the Court believe that the FEC did not "act" at all. Neither is the case. To the contrary, the FEC did act, CLC never had standing, the FEC never lost jurisdiction, and the case is moot. The Court should reject CLC's arguments and allow the FEC's decision to govern this matter.

To do otherwise would waste judicial resources, prolonging a case which only began because of deliberate concealment of the FEC's action by three Commissioners, and which clearly moot now that the FEC's decision has been revealed. Moreover, allowing this case to

1

continue would incentivize Commissioners who disagree with FEC non-enforcement decisions to pursue similar concealment tactics in the future.[1]

## ARGUMENT

### I.     This Case Should Be Dismissed for Lack of Standing and/or Mootness

CLC's Opposition to Iowa Values' Motion (ECF No. 67, the "Opp.") seeks to sidestep the threshold question of this Court's jurisdiction by again accusing Iowa Values of seeking to "relitigate" the Court's prior orders. *See, e.g.*, Opp. at 2, 13, 16–17. This accusation rings hollow, particularly given the unusual circumstances of this case. The Court should grant summary judgment because (1) CLC currently lacks standing or (2) as a matter of prudential mootness, because the FEC has revealed that it did not find reason to believe that Iowa Values violated FECA.

#### A.     The Question of Jurisdiction Is Properly Before the Court

CLC's suggestion that jurisdiction cannot be raised at this point in the litigation flies in the face of black-letter law. *See, e.g.*, *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) ("The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation . . . ."). Although CLC would prefer that the Court ignore Iowa Values' jurisdictional arguments and proceed directly to the merits of CLC's complaint, the jurisdictional question must be resolved "[b]efore a court may 'proceed at all in any cause.'" ECF No. 21 at 4 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)).

CLC's assertion that the Court has irrevocably determined jurisdiction cannot be supported. CLC ignores the fact that the actual status of MUR No. 7674 was ***not*** "before the Court"

---

[1] *See* Motion at 21–22 & 21 n.7 (describing Commissioner Weintraub's self-acknowledged strategy of facilitating private enforcement suits by concealing FEC votes declining to pursue enforcement).

in *CLC v. FEC*.[2] Because of the deliberate strategy of concealment by three Commissioners, the FEC was not permitted even to make an appearance in the case and, as a result, the Court was unaware of the FEC's actions on the MUR—including the reason-to-believe vote held on January 26, 2021, which occurred before the Court issued its February 11, 2021 order authorizing CLC to bring this private suit. *See* ECF No. 64 ¶¶ 52–53 (the "SUF").

Moreover, the reasonableness of the FEC's handling of CLC's administrative complaint was not "actually litigated" in *CLC v. FEC*. The FEC never appeared in the case. As a result, the default judgment has no preclusive effect.[3] *See CLC v. FEC*, No. 21-cv-406, 2022 WL 1978727, at \*3 (D.D.C. June 6, 2022) (Kelly, J.) (noting that prior rulings that the FEC's "failure to act was contrary to law" and that the FEC had failed to conform to the court's order to act "are not preclusive"); *see also* Motion at 13–14. In other words, now that the actual facts are before the Court for the first time, Iowa Values' Motion is the first opportunity to address the fundamental questions of standing, subject-matter jurisdiction, and mootness.

## B.    CLC Lacks Standing to Maintain This Suit

CLC attempts to separate the question of its standing from the question of the Court's jurisdiction. *See* Opp. at 15–16. However, the two are inseparable. If CLC failed to satisfy the statutory prerequisites to bring this suit—or if it lacks the necessary ongoing interest in the outcome—it lacks standing. "A district court also lacks subject matter jurisdiction if plaintiff cannot establish Article III standing." *Caldwell v. Kagan*, 777 F. Supp. 2d 177, 179 (D.D.C. 2011).

---

[2] Except where otherwise noted, "*CLC v. FEC*" refers to CLC's delay suit against the FEC with respect to MUR No. 7674. *See CLC v. FEC*, No. 1:20-cv-01778-RCL (D.D.C.).

[3] Nor did Iowa Values have any reason to intervene in the case, because the FEC's actions had been concealed from it as well.

CLC's assertion that it still has standing, and the case is not moot, rests entirely on its contention that it has suffered an "informational injury" resulting from Iowa Values' not registering as a political committee and making the disclosures required of political committees.[4] *See* Opp. at 34. CLC's ***allegations*** of "informational injury" may have been sufficient at the motion-to-dismiss stage, where the Court must generally accept a plaintiff's allegations as true, but that is not the case on summary judgment. Unlike at the motion-to-dismiss stage, the facts have been established and are now undisputed. We now know that the FEC voted on the merits of CLC's allegations and did not find reason to believe that Iowa Values violated FECA. The three controlling Commissioners submitted a statement of reasons, thoroughly explaining why CLC's allegations were without merit. *See* ECF No. 64-4 at 3, 10–14. To the extent CLC was not satisfied with this result, it could have challenged the FEC's decision in court.[5] This eliminates any possibility CLC could be found to have suffered an "informational injury."  CLC does not have a right to proceed and force Iowa Values to make disclosures as if CLC had actually prevailed on the merits where, as here, CLC has already the obtained the relief it sought—a review of the merits of its claim. *See Ruseva v. Rosenberg*, 490 F. Supp. 3d 320, 322–23 (D.D.C. 2020) (denying petition as moot in USCIS case where plaintiff had already received the relief she desired—namely, adjudication of her pending naturalization application). CLC is not entitled to anything further.

---

[4] CLC contends that "Iowa Values does not dispute and thus concedes that CLC has suffered an informational injury . . . ." Opp. at 13. CLC is wrong. Iowa Values' Motion made clear that the FEC's decision rendered moot CLC's purported "informational interest."  Motion at 16.

[5] Indeed, unlike some statements of reasons, there is no mention of prosecutorial discretion as the basis for finding no reason to believe. Thus, the substantive issues would have been subject to review by the District Court had CLC chosen to seek such review. *Cf. CREW v. FEC*, 993 F.3d 880, 887 (D.C. Cir. 2021).

**C.     Dismissal Is Appropriate Under the Prudential Mootness Doctrine**

Even assuming *arguendo* that this Court could, as a matter of subject-matter jurisdiction, allow this case to proceed, there remains the question whether it *should* do so. While CLC attempts to rebut Iowa Values' arguments regarding Article III mootness, it does not address Iowa Values' argument under the prudential mootness doctrine. *See* Motion at 17–24.

Resolution of complaints under FECA by the FEC is clearly preferable to resolution by courts. Congress gave the FEC primary jurisdiction over enforcement of FECA and, in creating a mechanism for judicial intervention, did not "intend[]" to "transfer . . . prosecutorial discretion from the Commission to the courts." *Common Cause v. FEC*, 489 F. Supp. 738, 743–44 (D.D.C. 1980) (quoting 125 Cong. Rec. S19099 (daily ed. Dec. 18, 1979) (statement of Senator Pell)). Here, it is now undisputed that the FEC already made its decision on CLC's complaint *before* the Court authorized this suit. Any future decision by this Court on the merits of CLC's allegations would either be duplicative of the FEC's decision or inconsistent with it. This would simply be a waste of the Court's and the parties' resources.

The FEC's complaint-resolution process is also preferable in that it contains provisions designed to protect the confidentiality of respondents such as Iowa Values. *See* Motion at 19 n.6. Under that process, the public—including CLC—could not obtain information about Iowa Values' donors unless the FEC's enforcement process concluded with a finding that Iowa Values was a political committee. If this case proceeds and CLC is allowed to obtain the discovery it seeks, Iowa Values will be forced to disclose that same information before the Court reaches any finding on the merits of CLC's claim. In other words, CLC would obtain the ***ultimate relief*** sought in its original complaint to the FEC. This is especially inappropriate here, where the FEC has weighed

the merits and ***failed to find reason to believe*** that Iowa Values should be required to disclose this information.

Last, but not least, allowing this case to go forward would reward the unseemly tactics of the three-Commissioner bloc. *See* Motion at 21–23.[6]  Indeed, it would set a dangerous precedent and create an incentive for Commissioners to engage in similar conduct in the future.[7] Congress carefully designed the FEC to prevent a partisan bloc of Commissioners from triggering enforcement of FECA without bipartisan support. Absent agreement by a majority of Commissioners, the FEC cannot proceed with investigations and enforcement. However, if CLC's suit is allowed to proceed, the upshot will be that, any time three Commissioners favor enforcement against a respondent, they can achieve their goal without the necessary votes and bipartisan agreement by simply refusing to close the file, thereby concealing any vote by the FEC on the

---

[6] Incredibly, CLC suggests that the real reason the FEC's action on MUR No. 7674 was not disclosed sooner was that Iowa Values did not waive its confidentiality rights under FECA until December 23, 2021, when it served its first subpoena on the FEC. *See* ECF No. 67-1 at 15, Response to ¶ 30. However, if a majority of Commissioners had voted to close the file on January 28, 2021, in keeping with the FEC's traditional practice, the vote certification for the January 26, 2021 reason-to-believe vote would have been made public shortly thereafter. Iowa Values would not have needed to waive its confidentiality rights under Section 30109(12)(A) for the FEC to publicize this information after closing the file. Of course, due to the lack of transparency from the FEC, Iowa Values had no reason to know that any action on MUR No. 7674 had taken place. Moreover, even CLC acknowledges that Iowa Values did expressly waive its confidentiality rights on December 23, 2021. Yet the FEC continued to conceal its actions until after the August 29, 2022 vote to close the file. This alone belies any suggestion that the FEC was simply waiting for Iowa Values to waive its confidentiality rights before disclosing its action on the MUR.

[7] The three-Commissioner bloc's tactics have drawn the ire of multiple judges within this Circuit. *See, e.g.*, *CREW v. FEC (New Models)*, 55 F.4th 918, 921 (D.C. Cir. 2022) (Rao, J., concurring in denial of reh'g *en banc*) (expressing "concern" regarding "the actions of some commissioners . . . concealing the basis for Commission action or inaction" by "failing to make . . . decisions public" such that "the party complaining to the Commission, the target of the complaint, and the district court are all left in the dark about whether and how the Commission has acted"); *CLC v. FEC*, No. 21-cv-406, 2022 WL 1978727, at *4 (D.D.C. June 6, 2022) (Kelly, J.) (emphasizing that the court did not "condone the [FEC's] unseemly failure to appear and defend itself in this Court, or what Heritage Action casts as a scheme to hide its activity and leave regulated parties in legal limbo").

merits of the complaint. The action of the FEC would continue to be concealed because the three-Commissioner bloc would also refuse to allow the FEC to even appear in the inevitable delay suit. The complainant would be permitted to step into the shoes of the FEC and file a suit directly against the respondent which, if successful, would circumvent the FEC's deadlocked decision. This would thwart Congress's intentions and turn FECA on its head.

Indeed, it would make little sense for Congress to require four votes to proceed with any FEC enforcement, 52 U.S.C. § 30109(a)(2), if three Commissioners can effectively nullify a deadlock dismissal and keep the threat of enforcement dangling over a respondent indefinitely. Needless to say, such a scenario would also prejudice respondents and stymie effective judicial review of the FEC's actual actions.

## II.     The FEC Retained Jurisdiction Over MUR No. 7674

CLC's argument that, once a private suit is initiated under 52 U.S.C. § 30109(a)(8), the FEC is stripped of its jurisdiction is unconvincing, and CLC's reliance on cases from the immigration context to interpret FECA is unavailing. Nothing in the text of FECA suggests that the FEC loses jurisdiction, nor do the cases CLC cites support such a conclusion.

### A.      The Statute Does Not Divest the FEC of Jurisdiction for "Failure to Act" on a Matter

CLC's argument that the FEC lost jurisdiction fails. *See* Opp. at 36–38. CLC's selective quotations from cases in support of its contention omit important context. In reality, the relevant case law weighs *against* reading into Section 30109(a)(8) an intent to divest the FEC of jurisdiction as a remedy for untimeliness.

### 1. *Brock* Weighs Against Reading FECA as Divesting the FEC of Jurisdiction

CLC's reliance on *Brock v. Pierce Cnty.*, 476 U.S. 253 (1986), is misplaced. According to CLC, *Brock* stands for the principle that "[a] statute that 'both expressly requires an agency . . . to act within a particular time period and specifies a consequence for failure to comply with the provision' divests the agency of jurisdiction to act after the statutorily directed time period elapses." Opp. at 36 (quoting *Brock*, 476 U.S. at 36). CLC's cherry-picked quotation from *Brock* omits essential language and context. Read fully, *Brock* supports Iowa Values' position.

The statute at issue in *Brock*, Section 106(b) of the Comprehensive Employment and Training Act (CETA), provided that, within 120 days after receiving a complaint alleging misuse of CETA funds by a grant recipient, the Secretary of Labor "shall" issue a final determination as to the alleged misuse. *See Brock*, 476 U.S. at 254–55. However, "while § 106(b) speaks in mandatory language, it nowhere specifies the consequences of a failure to make a final determination within 120 days." *Id.* at 258. The Secretary "relie[d] on a line of precedent in the Courts of Appeals to the effect that Government agencies do not lose jurisdiction for failure to comply with statutory time limits unless the statute '*both* expressly requires an agency or public official to act within a particular time period *and* specifies a consequence for failure to comply with the provision.'" *Id.* at 259 (citation and internal quotation marks omitted).

The Supreme Court did not explicitly adopt the "both expressly requires . . . and specifies a consequence" language as a holding, but rather simply recognized that "this language evolved from a line of precedent in the Court of Appeals, which the Supreme Court 'never expressly adopted,' but whose underpinning[s] stem from decisions of the Supreme Court." *Perry v. Gonzales*, 472 F. Supp. 2d 623, 628 (D.N.J. 2007) (citing *Brock*, 476 U.S. at 259–60); *see also Hassan v. Holder*, 638 F. Supp. 2d 329, 332 (E.D.N.Y. 2009) ("[T]he *Brock* Court did not hold

that a statute must be read to strip the agency of authority to act where the statute specifies a time period for action and the consequences of a failure to act."). Moreover, CLC improperly converts *Brock*'s "two conditions" *from a restriction* on jurisdiction-stripping *to a mandate* for jurisdiction stripping. The *Brock* Court framed these "conditions" as a limitation of the circumstances under which a court may find that a statute divests an agency of jurisdiction (*i.e.*, a statute *cannot* divest an agency of jurisdiction *unless* it (1) both expressly requires agency action within a particular time period *and* (2) specifies a consequence for failure to act), not as requirement that a statute *must always* be read to divest an agency of jurisdiction where the two criteria are met.

More importantly, even accepting CLC's formulation of the *Brock* "conditions" as correct does not require a finding that FECA divests the FEC of jurisdiction.

First, FECA does not actually use "shall" language comparable to the language in *Brock*—which, while not sufficient under *Brock* to demonstrate congressional intent to strip an agency of jurisdiction, is a necessary precondition for a finding that a statute does strip an agency of jurisdiction.

Second, although FECA does describe some "consequence" for the FEC failing to conform to a court order to act—namely, that the complainant may bring a private suit against the respondent—it does not follow that this "consequence" must also entail a loss of jurisdiction by the FEC. *See Kim v. Gonzales*, No. 07-cv-01817, 2008 WL 1957739, at *3 (D. Colo. May 5, 2008) (rejecting notion that "the mere fact that Congress specifies as a consequence of delay that the court acquires jurisdiction means that the agency is necessarily deprived of it").

Finally, and most importantly, the determination of whether Section 30109(a)(8)(C) strips the FEC of jurisdiction should be guided by the fundamental principle that *Brock* articulated—

namely, that courts should apply a presumption *against* finding that Congress, in setting a deadline for an agency to act, intended to divest that agency of jurisdiction if it misses the deadline:

> We would be most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake. When, as here, there are less drastic remedies available for failure to meet a statutory deadline, courts should not assume that Congress intended the agency to lose its power to act.

*Brock*, 476 U.S. at 260 (citations omitted); *see also Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 158–59 (2003) (quoting *United States v. James Daniel Good Real Property*, 510 U.S. 43, 63 (1993)) ("Nor, since *Brock*, have we ever construed a provision that the Government 'shall' act within a specified time, without more, as a jurisdictional limit precluding action. . . .'"); *Regions Hosp. v. Shalala*, 522 U.S. 448, 459 n.3 (1998) (citing *Brock*, 476 U.S. at 260) ("The Secretary's failure to meet the deadline, a not uncommon occurrence when heavy loads are thrust on administrators, does not mean that official lacked power to act beyond it."); *U.S. v. Dolan*, 571 F.3d 1022, 1027–28 (10th Cir. 2009) (Gorsuch, J.) (quoting *Barnhart*, 537 U.S. at 160) (discussing the "essential canon of statutory construction . . . against 'readily infer[ring] congressional intent to limit an agency's power to get a mandatory job done merely from a specification to act by a certain time'"); *Hassan*, 638 F. Supp. 2d at 332 (explaining that "[t]he *Brock* Court's actual holding is . . . that unless there is an 'indication in the statute or its legislative history that Congress intended to remove' an agency's authority to act after the expiration of a given time period, courts should not presume Congressional intent to deprive an agency of jurisdiction."). Applying this principle, *Brock* found "[t]he 120-day provision was clearly intended to spur the Secretary to action, not to limit the scope of his authority" to issue a decision after the deadline. *Brock*, 476 U.S. at 265–66.

**2.      The INA Cases Cited by CLC Do Not Support Divesting the FEC of Jurisdiction**

CLC does not cite a single case in the FECA context to support its contention that Congress intended to deprive the FEC of jurisdiction to take any action on a complaint if it fails to do so within the time prescribed under Section 30109(a)(8)(C). Instead, CLC relies exclusively on a handful of cases from other jurisdictions construing a provision of the Immigration and Nationality Act (INA), 8 U.S.C. § 1447(b). *See* Opp. at 37. But even those cases do not support CLC's contention. CLC paints an incomplete picture of the caselaw regarding Section 1447(b).

Under Section 1447(b):

If there is a failure [by USCIS] to make a determination … before the end of the 120–day period after the date on which the examination is conducted under such section, the applicant may apply to the United States district court for the district in which the applicant resides for a hearing on the matter. Such court has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to the Service to determine the matter.

8 U.S.C. § 1447(b). CLC claims that "courts have uniformly concluded" that this provision strips USCIS of jurisdiction over a naturalization application "if it fails to act by the statutory deadline and an applicant files a petition in federal court." Opp. at 37 (citing cases). Thus, according to CLC, this Court should make the same finding regarding FECA. CLC's premise, however, is incorrect and, in any event, the conclusion does not follow.

In fact, numerous district courts have found that Section 1447(b) does *not* divest USCIS of jurisdiction, but rather allows USCIS and the court to exercise concurrent jurisdiction. *See, e.g.*, *Perry*, 472 F. Supp. 2d at 627–30 (finding that "the best way to effectuate the Congressional intent is to allow concurrent jurisdiction between CIS and the District Court following the filing of a Complaint with the District Court as authorized by § 1447(b)"); *Al-Saleh v. Gonzales*, No. 2:06-cv-00604, 2007 WL 990145, at *2 (D. Utah Mar. 29, 2007) ("Although the issue is far from clear,

11

this court believes that the better-reasoned view is that § 1447(b) does not divest the USCIS of jurisdiction," as "[t]he fact that § 1447(b) gives an applicant the right to file suit in federal court after the 120-day period has elapsed is not, by itself, a sufficient indication that Congress intended to strip the USCIS of jurisdiction once a federal suit is filed").[8] Courts taking the "concurrent jurisdiction" view of Section 1447(b) have emphasized the *Brock* presumption against stripping agencies of jurisdiction. *See, e.g.*, *Perry*, 472 F. Supp. 2d at 628; *Hassan*, 638 F. Supp. 2d at 332; *Kim*, 2008 WL 1957739, at *3 (finding "the reasoning of *Perry* . . . more persuasive" than that of *Hovsepian*, "particularly in light of the United States Supreme Court's general policy concerning stripping agencies of jurisdiction as noted in [*Brock*]").

Courts taking the "concurrent jurisdiction" approach have found that the jurisdiction-stripping approach would undermine Congress's purpose of promoting speedy resolution of applications. *See Perry*, 472 F. Supp. 2d at 629 ("The inescapable conclusion is that much judicial

---

[8] *See also, e.g.*, *Maki v. Gonzales*, No. 2:06-cv-794, 2007 WL 22202532, at *2 (D. Utah July 30, 2007) (finding that "the better-reasoned view is that section 1447(b) does not divest the USCIS of jurisdiction"); *Kremmer v. Gonzalez*, No. 08-cv-306, 2009 WL 3150416, at *2 (E.D. Okla. Sept. 30, 2009) (suggesting that "[i]t would appear concurrent jurisdiction would more fully accomplish the goals of the [INA] and Plaintiff . . . in obtaining the most expeditious ruling upon his naturalization application," and noting that "nothing in the language of [Section 1447(b)] appears to vest exclusive jurisdiction in the district court when Congress clearly could have done so."); *Farah v. Gonzales*, No. 05-cv-1944, 2006 WL 1116526, at *2 (D. Minn. Apr. 26, 2006) (denying plaintiff's suit under Section 1447(b) as moot where CIS had denied his application after his filing of the suit); *Kim v. Gonzales*, No. 07-cv-01817, 2008 WL 1957739, at *3–4 (D. Colo. May 5, 2008) (finding concurrent jurisdiction view "more persuasive" but finding no need to "resolve this thorny issue . . . as in either case I would decline to determine the matter on the merits").

In addition, prior to the Ninth Circuit's *en banc* decision in *Hovsepian* adopting the jurisdiction-stripping interpretation of Section 1447(b), a Ninth Circuit panel had adopted the concurrent jurisdiction view. *See U.S. v. Hovsepian*, 307 F.3d 922 (9th Cir. 2002). The Fourth Circuit panel's decision in *Etape* adopting the jurisdiction-stripping interpretation—and reversing district courts which had taken the concurrent-jurisdiction view—also prompted a vigorous dissent. *See Etape*, 497 F.3d at 388–97 (Hamilton, J., dissenting). Given this significant disagreement among federal judges, CLC's portrayal of the jurisdiction-stripping view of Section 1447(b) as something on which courts have unanimously agreed is incorrect and misleading.

time and resources will be saved if CIS is not stripped of jurisdiction while the matter is pending in the district court.").

That reasoning applies here. Congress gave the FEC primary jurisdiction over FECA, and stripping it of that jurisdiction for missing a deadline would not serve Congress's purposes. Congress did not intend for Section 30109(a)(8) to "work a transfer of prosecutorial discretion from the Commission to the courts." *Common Cause v. FEC*, 489 F. Supp. 738, 743–44 (D.D.C. 1980) (quoting 125 Cong. Rec. S19099 (daily ed. Dec. 18, 1979) (statement of Senator Pell)). Moreover, just as the *Perry* court observed with respect to naturalization applications, divesting the FEC of jurisdiction would not lead to faster resolution of complaints. In this case, for example, allowing the FEC's January 26, 2021 decision to govern the matter will result in a more efficient resolution of CLC's allegations than would further litigation in this Court—which could only result in a decision either duplicative of or inconsistent with the FEC's decision.

Meanwhile, even the cases CLC cites in which courts found that Section 1447(b) strips USCIS of jurisdiction do not support applying the same approach to FECA. Crucially, CLC omits the reasoning underpinning the courts' holdings. The final sentence of Section 1447(b)—"Such court has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to the Service to determine the matter"—was critical to those courts' analysis.[9] In particular, the courts that embraced the jurisdiction-stripping reading of Section 1447(b) focused on the fact that it gives the district court the option to "remand the matter" to

---

[9] For example, the Seventh Circuit stated: "Congress gave the district courts the power to 'determine the matter' once a naturalization petition is properly in front of it; it would be illogical to read this unqualified grant of power to contain an unwritten 'if ...,' or to give USCIS the prerogative to nullify the court's statutory power." *Aljabri*, 745 F.3d at 820 (citing *Bustamante*, 582 F.3d at 406; *Etape*, 497 F.3d at 383; *Hovsepian*, 359 F.3d at 1160).

USCIS. Those courts found that the "remand" language would make no sense if USCIS retained concurrent jurisdiction anyway.[10]

Crucially, Section 30109(a)(8) contains no comparable language. Thus, the reasoning underlying the decisions in the four Section 1447(b) cases cited by CLC does not support a finding that FECA intended to strip the FEC of jurisdiction.

In short, nothing in the text or legislative history of FECA indicates that Congress intended to strip the FEC of jurisdiction. There is no language comparable to the language that has led some—certainly not all—courts to find that Section 1447(b) strips USCIS of jurisdiction where it fails to take timely action and the applicant goes to court. Thus, applying the *Brock* presumption against jurisdiction-stripping and considering Congress's purposes in enacting FECA, this Court should not read FECA as depriving the FEC of jurisdiction to belatedly act on a complaint.[11]

---

[10] *See, e.g.*, *Aljabri*, 745 F.3d at 820 (noting that the government's preferred reading "would render meaningless the district court's power to 'remand the matter' if the agency could act even without a remand"); *Bustamante*, 582 F.3d at 406–07 ("By providing the district court with the option to 'remand the matter, with appropriate instructions, to [USCIS],' 8 U.S.C. § 1447(b), Congress intended that, after an applicant files a proper Section 1447(b) petition, USCIS would lack the authority to decide an application absent a remand. To read the statute otherwise, as both *Etape* and *Hovsepian* recognized, would render the 'remand' language in the statute meaningless."); *Etape*, 497 F.3d at 384 ("Congress would not have granted district courts the power of 'remand'— the power to 'send back'—if a naturalization application remained with the CIS after the filing of a § 1447(b) petition. For in that situation, there would be no need for the district court to send anything back—because the CIS would have had the matter all along."); *Hovsepian*, 359 F.3d at 1160 ("If the INS already had the power 'to determine the matter' in the meantime, th[e] phrase ['remand the matter, with appropriate instructions, to the Service to determine the matter'] would be surplusage.").

[11] Another distinction between FECA and Section 1447(b) is that, here, another party (Iowa Values) would be harmed by disregarding the FEC's action. There is no similar concern in the INA context.

B.      **CLC's Two Alternative Arguments Regarding Jurisdiction Fail**

CLC tries to paint two specific points in time when the FEC lost jurisdiction. Neither makes

sense.

1.      **Jurisdiction When the FEC Failed to Conform to the Court's Order.**

CLC first attempts to argue that "the FEC lost jurisdiction over the administrative matter

after January 12, 2022 [*sic*], when [it] failed to conform to this Court's October 14, 2020 order

requiring the FEC to take action on CLC's administrative complaint within 90 days." Opp. at 36.

This argument is meritless. Tellingly, CLC cites ***no case*** in which a court treated an agency's

failure to meet a deadline as resulting in an automatic loss of agency jurisdiction.[12] Indeed, even

in the cases cited by CLC construing Section 1447(b) of the INA, the courts that embraced the

jurisdiction-stripping view of that provision found that USCIS loses jurisdiction *only after* an

applicant actually files a petition in court, *not* automatically after the 120-day deadline.[13]  There

simply is no support for CLC's argument that the FEC lost jurisdiction after January 12, 2021.

---

[12] The only case CLC cites in support of its argument that the FEC lost jurisdiction after January 12, 2021 is *Brock*. *See* Opp. at 36. However, as explained above, the *Brock* Court found that the statute at issue did not strip the agency of jurisdiction at all, and it instructed courts to apply a presumption against reading statutes as stripping agencies of jurisdiction to act after a deadline where there are "less drastic" alternatives available. *See Brock*, 476 U.S. at 260.

[13] *See, e.g.*, *Aljabri*, 745 F.3d at 821 (holding that "when an applicant for naturalization has properly invoked § 1447(b) and brought an application to the district court, that court has exclusive jurisdiction over the naturalization application . . . ."); *Etape*, 497 F.3d at 384 (holding that "proper filing of a § 1447(b) petition provides a federal court with exclusive jurisdiction over a naturalization application"); *Bustamente*, 582 F.3d at 407 (after 120-day deadline, "[i]f the naturalization applicant chooses to do nothing, the application will remain pending before USCIS with the agency maintaining jurisdiction to decide the application"); *see also Pharaon v. Thompson*, No. 09-cv-04491, 2010 WL 2942656, at *5 (D.N.J. July 21, 2010) (dismissing applicant's suit pursuant to Section 1447(b) as moot where USCIS failed to act on application within 120-day period but then denied it before plaintiff filed complaint in court, and explaining that if plaintiff wished to proceed in court under Section 1447(b), he "was required to exercise that option upon expiration of the statutorily prescribed 120-day period and prior to receipt of the decision by USCIS").

## 2.    Jurisdiction After This Case Began.

Perhaps recognizing this, CLC quickly pivots to arguing in the alternative that, "[a]t the latest, the FEC lost jurisdiction on February 12, 2021, when CLC opted to exercise its right to file this citizen suit." Opp. at 37. For the reasons explained above, this argument fails, as well. However, even were it correct, it would be no help to CLC, because the FEC had already acted on CLC's complaint on January 26, 2021. In other words, the FEC plainly retained jurisdiction as of the time it took its substantive action on MUR No. 7674.

## III.    CLC's Argument that There Was No FEC Action Turns FEC Procedure on its Head and Demonstrates Why the Court *Should* End this Case.

CLC's attempt to reduce Iowa Values' Motion to a "collateral attack" on this Court's prior decisions is incorrect and turns FECA on its head. Simply put, CLC would have this Court allow this case to go forward even though the FEC has now made public the decision it reached before CLC was authorized to bring this suit. CLC's views of FEC action would bring respondents into a Kafkaesque proceeding where three hostile commissioners at the agency with enforcement authority could convert the matter to private litigation even though the statute requires bipartisan support before a matter can move to an investigation. Ultimately, however, none of this should matter. Iowa Values is not launching a collateral attack on this Court's decision that the FEC did not act timely. It is arguing that the fact that the FEC has now acted renders the case moot. Nonetheless, it is important for the Court to understand the actions the FEC did take, when it took them, and how courts in this circuit view these actions.

### A.    The Deadlocked Reason-to-Believe Vote Constituted FEC "Action"

CLC contends that the FEC's January 26, 2021 reason-to-believe vote did not constitute "action" by the FEC. *See* Opp. at 22. Yet, the D.C. Circuit has repeatedly recognized that a deadlocked FEC vote on whether to proceed with an investigation or enforcement action is a

16

substantive "action" by the FEC. For instance, in *Democratic Congressional Campaign Committee v. FEC* ("*DCCC*"), 831 F.2d 1131 (D.C. Cir. 1987), the D.C. Circuit held that a deadlock decision not to launch an investigation "is reviewable" and required the FEC to explain its decision not to find reason to believe so that the FEC, "and not a court of review, will serve as a primary decisionmaker in the area Congress has committed, initially, to the FEC's charge." *Id.* at 1133.

Since *DCCC*, this Circuit has treated deadlocked votes failing to find reason to believe as the substantive FEC action, insisting that the Commissioners voting not to find reason to believe issue a statement of reasons explaining the vote because such a statement is "necessary to allow meaningful judicial review." *Common Cause v. FEC*, 842 F.2d 436, 449 (D.C. Cir. 1988). As the D.C. Circuit subsequently explained, "[w]e further held [in *DCCC*] that, to make judicial review a meaningful exercise, the three Commissioners who voted to dismiss must provide a statement of their reasons for so voting. Since those Commissioners constitute a controlling group for purposes of the decision, their rationale necessarily states the agency's reasons for acting as it did." *FEC v. Nat'l Republican Senatorial Comm. ("NRSC")*, 966 F.2d 1471, 1476 (D.C. Cir. 1992). More recently, in *Citizens for Responsibility and Ethics in Washington ("CREW") v. FEC*, 892 F.3d 434 (D.C. Cir. 2018), the D.C. Circuit squarely stated that the FEC's deadlock "dismissal of CREW's complaint constituted . . . 'agency action.'" *CREW v. FEC*, 892 F.3d at 437.

The D.C. Circuit's discussion of FECA in *Pub. Citizen, Inc. v. Federal Energy Regulatory Comm'n ("FERC")*, 839 F.3d 1165 (D.C. Cir. 2016), is also instructive. There, the D.C. Circuit rejected the argument that a deadlock of FERC Commissioners constituted agency action and distinguished the Federal Power Act (FPA) from the FEC and FECA, explaining that "we have held [FEC] engages in final agency action when . . . it deadlocks about whether probable cause

exists to proceed with an investigation." *Id* at 1170 (citing *FEC v. NRSC*, 966 F.2d at 1476). The court made several important observations about FECA's unique structure:

- "FECA's text explicitly permits review of probable-cause deadlocks as agency action."

- "FEC cannot investigate complaints absent majority vote, *see id.* § 30109(a)(2), meaning the statute compels FEC to dismiss complaints in deadlock situations."

- "[T]he treatment of probable cause deadlocks as agency action is baked into the very text of the statute."

- "Congress uniquely structured the FEC toward maintaining the status quo, increasing the appropriateness of recognizing deadlocks as agency action in that specific context."

- "The voting and membership requirements mean that, unlike other agencies—where deadlocks are rather atypical—FEC will regularly deadlock as part of its *modus operandi*."

*Id.* at 1170–71. The court concluded this analysis of the FEC by observing, "[t]aken together, FEC's structural design and FECA's legal requirement to dismiss complaints in deadlock situations mark FECA as an exception to the rule." *Id.* at 1171.

Moreover, the FEC itself refers to deadlocked votes such as the January 26, 2021 vote as "action" by "the Commission." *See, e.g.*, SUF ¶¶ 52–53 (citing Ex. C (certifying that "on January 26, 2021, the Commission took the following **actions** in MURs 7672, 7674 and 7732," including "fail[ing] by a vote of 3-3" to "[f]ind reason to believe that Iowa Values violated 52 U.S.C. §§ 30102, 30103, and 30104, by failing to organize, register, and report as a political committee")) (emphasis added). It is difficult to understand how six Commissioners taking a vote on the merits of a complaint does not qualify as "doing something"—and courts have repeatedly recognized that words in a statute should generally be given their ordinary meaning. *See, e.g.*, *Wisconsin Central Ltd. v. U.S.*, 138 S.Ct. 2067, 2070 (2018) (quoting *Perrin v. United States*, 444 U.S. 37, 42, 100

S.Ct. 311 (1979)) ("As usual, our job is to interpret the words consistent with their "ordinary meaning . . . at the time Congress enacted the statute.").

**B.      CLC Would Allow the Refusal to Close a File to Impose a Four-Vote Requirement to End a Matter in Contravention of the Clear Text of the Statute**

CLC makes much about the concept of an "automatic-dismissal" theory. Iowa Values' argument is not that the reason-to-believe vote necessarily automatically dismissed the case. Rather, it is that the tie vote was the substantive decision that decides the outcome of the complaint on the merits and closing the file is a ministerial action. For the 40 years prior, the next step was the ministerial vote to close the file. That did not happen in this case because three commissioners decided to try out the private enforcement mechanism by refusing to close the file or defend the agency in court where there was no good-faith belief that the vote would change within a reasonable time. *See, e.g.*, *Statement of Vice Chair Ellen L. Weintraub Regarding* CREW v. FEC & American Action Network (Apr. 19, 2018), https://www.fec.gov/resources/cms-content/documents/2018-04-19-ELW-statement.pdf (Commissioner Weintraub acknowledging her strategy to circumvent FEC deadlocks by "breaking the glass" and enabling complainants to pursue private suits); Shane Goldmacher, *Democrats' Improbable New F.E.C. Strategy: More Deadlock Than Ever*, N.Y. TIMES (June 8, 2021), https://nyti.ms/3ynO2qb (discussing concealment strategy through which Commissioner Weintraub and her allies have led courts to believe that "deadlocked cases are unresolved," so as to "open the door for outside advocacy groups to directly sue . . . in federal court"). Commissioner Weintraub has openly acknowledged pursuing this strategy because she believes complainants will have "a better shot" in federal court than at the FEC. *See* Goldmacher, *Democrats' Improbable New F.E.C. Strategy*.

CLC observes that, under FECA, "'the affirmative vote of 4 members' is required . . . for certain FEC actions." Opp. at 5 (quoting 52 U.S.C. § 30106(c)). True enough, but the key word is "certain." CLC omits to mention which FEC "actions" do and do not require four votes. The D.C. Circuit addressed this very issue in *Citizens for Responsibility and Ethics in Washington ("CREW") v. FEC*, 993 F.3d 880, 891 (D.C. Cir. 2021) (*New Models*), rejecting CREW's argument that "four commissioners must concur not only in enforcement actions, but also in nonenforcement actions," and explaining that because FECA expressly requires four votes for certain actions, and "dismissals are not on this list . . . [a] decision to initiate enforcement, but not to decline enforcement, requires the votes of four commissioners." *New Models*, 993 F.3d at 891. Consistent with this observation, the D.C. Circuit and other courts have repeatedly recognized that a deadlocked FEC vote on whether to pursue an investigation or enforcement action is not only an "action" by the FEC but, more specifically, an action that results in dismissal of a complaint.[14] Thus, the January 26, 2021 vote constituted agency action that resulted in dismissal of CLC's complaint.[15]

---

[14] *See, e.g.*, *CREW v. FEC*, 316 F. Supp. 3d 349, 416–17 (D.D.C. 2018) (*Crossroads I*) (quoting *CREW v. FEC*, 892 F.3d 434, 437 (D.C. Cir. 2018) (*Commission on Hope*)) ("The FEC, when considering whether to commence enforcement proceedings based on an administrative complaint, must dismiss the administrative complaint when the members deadlock three-to-three because 'under FECA, the [FEC] may pursue enforcement only upon an affirmative vote of 4 of its members.'"); *CREW v. FEC*, 892 F.3d at 437 (noting that the FEC's deadlock dismissal "support[ed] the district court's jurisdiction" because "[t]he deadlock meant that the Commission could not proceed"); *Public Citizen*, 839 F.3d at 1170 ("FEC cannot investigate complaints absent majority vote . . . meaning the statute compels FEC to dismiss complaints in deadlock situations."); *id.* at 1171 (noting "FECA's legal requirement to dismiss complaints in deadlock situations"); ECF No. 64-4 (Statement of Reasons) at 21 ("Congress included this four-vote requirement to ensure that Commission enforcement action could not proceed absent bipartisan support. We are thus prohibited by law from taking any action on a complaint until it is satisfied. If such vote fails, that is the end of the matter.").

[15] CLC claims that "*New Models* did not 'explicitly acknowledge the existence of "deadlock dismissals"' as claimed by Iowa Values," but rather "merely acknowledges 'the *possibility* of 'deadlock dismissals' . . . .'" Opp. at 28 (quoting Motion at 11 (quoting ECF No. 64-4 at 20–21)).

Seeking to resist this conclusion, CLC argues that the FEC's subsequent votes on whether to close the file undercut the notion that the 3-3 deadlocked reason-to-believe vote terminated the matter. Opp. at 26. This argument fails. The vote to close the file is not required by FECA. It has traditionally been treated as a ministerial vote, a mere reflection of the substantive vote that has already taken place. *See Statement of Chairman Allen J. Dickerson and Commissioners Sean J. Cooksey and James E. "Trey" Trainor, III Regarding Concluded Enforcement Matters* at 2 (May 13, 2022), https://www.fec.gov/resources/cms-content/documents/Redacted_Statement_Regarding_Concluded_Matters_13_May_2022_Redacted.pdf ("[A] vote to close the file, while welcome and administratively convenient, is legally immaterial.").[16] Indeed, but for the improper tactics of three Commissioners, the FEC would have promptly closed the file after the deadlocked reason-to-believe vote in this case, as well. The fact that three Commissioners refused to do so, and that it took roughly a year and a half, and multiple attempts, before the FEC was able to close the file, does not detract from the legal significance of the January 26, 2021 reason-to-believe vote.

---

CLC's attempt at hair splitting is unpersuasive in light of the numerous cases from within this Circuit, cited here and in Iowa Values' Motion, explicitly recognizing deadlock dismissals. Indeed, in stating that "our previous cases . . . have recognized the possibility of 'deadlock dismissals,'" the *New Models* court cited *Common Cause*, in which the court dedicated an entire section of its opinion to discussing "deadlock-vote dismissals" and noted that, in *DCCC*, "we upheld the district court's remand to the Commission for a statement of reasons explaining its deadlock dismissal." *See New Models*, 993 F.3d at 891; *Common Cause*, 842 F.2d at 449 (emphasis added). Clearly, in using the word "possibility," the *New Models* court did not mean to suggest that "deadlock dismissals" are merely a theoretical possibility.

[16] *See also, e.g.*, MUR 5024, Certification (Nov. 4, 2003) (voting 6-0 to close the file after splitting 3-3 on whether there was reason to believe); FEC's Partial Mot. to Dismiss at 12, *CREW v. FEC*, 243 F. Supp. 3d 91 (D.D.C. 2017) (No. 16-cv-259), Dkt. No. 12 (explaining that "[a]s a result of" a "three-to-three" "split vote, the Commission closed the file"); FEC's Motion to Dismiss at 11, *CREW v. FEC*, 164 F. Supp. 3d 113 (D.D.C. 2015) (No. 14-cv-1419), Dkt. No. 5 ("If at least four of the FEC's six Commissioners vote to find such reason to believe, the Commission may investigate the alleged violation; otherwise, the Commission dismisses the administrative complaint.").

To hold otherwise would reward the cynical scheme by those Commissioners to hide that vote from the Court, the parties, and the public.

**C.     The Timing of the FEC's Action Was Not "Unreasonable" Under *TRAC* and *Common Cause***

CLC itself is intent on relitigating the merits of its delay suit. Iowa Values is happy to do so since the timeline shows that the agency took action, but three commissioners refused to make that action public. None of this matters, of course, because Iowa Values does not suggest that whether the FEC acted timely bears on the ultimate question before this Court. It is worth noting, however, that inaction by the FEC does not become "contrary to law" simply because 120 days have elapsed since the filing of a complaint. *See In re Nat'l Congressional Club*, Nos. 84-5701, 84-5719, 1984 WL 148396 (D.C. Cir. Oct. 24, 1984) (per curiam); *Common Cause*, 489 F. Supp. at 743–44. Instead, inaction by the FEC is "tested under standards generally applicable to review of agency inaction." *In re Nat'l Congressional Club*, Nos. 84-5701, 84-5719, 1984 WL 148396, at *1 (D.C. Cir. Oct. 24, 1984). Applying those standards, the D.C. Circuit has found even a two-year delay between the filing of an administrative complaint with the FEC and its conclusion not necessarily contrary to law. *See FEC v. Rose*, 806 F.2d 1081, 1091 & n.17 (D.C. Cir. 1986) (*citing Common Cause*, 489 F. Supp. at 743–44).[17]

In this case, the FEC's delay in acting on CLC's complaint was not unreasonable under the circumstances. At the time CLC filed its complaint, on December 19, 2019, the FEC lacked a quorum, and this lack of quorum continued for more than the 120 days that followed. *See* ECF No.

---

[17] Courts assess whether inaction by the FEC is "contrary to law" by considering six non-exhaustive factors outlined in *Telecommunications Research and Action Center (TRAC) v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984), as well as five factors set out in *Common Cause*. *See FEC v. Rose*, 806 F.2d 1081, 1084 (D.C. Cir. 1986).

64 ¶ 19. The FEC had a quorum for only 25 days before CLC filed its delay suit against the FEC. *See id.* ¶ 20. The FEC lost the quorum again three days after CLC's complaint was filed, and before the FEC even received proper service. *See id.* The FEC did not regain a quorum until December 14, 2020, two months after the Court's entry of default judgment. *See id.* ¶¶ 22, 24; *see also* ECF No. 13-1 at p. 13). The FEC then held its first post-quorum executive session on January 12, 2021. The very next executive session was the January 26, 2021 session at which the Commissioners voted on CLC's complaint. In other words, the Commissioners, despite facing a significant backlog after so much time without a quorum, voted on CLC's complaint in only their second post-quorum executive session, only slightly over a month after regaining a quorum.[18] Thus, for all but 28 days between the filing of CLC's complaint and the Court's contrary-to-law ruling, the FEC legally could not take any action on CLC's complaint.[19]

Courts in this District have accounted for the FEC's lack of a quorum in adjudicating delay suits against the FEC under Section 30109(a)(8). For example, in *CLC v. FEC*, No. 20-cv-00809-ABJ (D.D.C. Mar. 11, 2021), the court held that entering a default judgment and declaring that the FEC's inaction was "contrary to law" would be "premature" and "inherently unfair" where—as here—the FEC's inaction was the result of a lack of quorum. *Id.* In denying CLC's motion, Judge Jackson also suggested that the FEC's failure to appear during the approximately four months since restoration of a quorum was not evidence of a "lack of diligence" under the circumstances.

---

[18] *See* NPR, *The Federal Election Commission Can Finally Meet Again. And It Has A Big Backlog* (Dec. 24, 2020), npr.org/2020/12/24/949672803/the-federal-election-commission-can-finally-meet-again-and-it-has-a-big-backlog.

[19] In its motion for a default judgment CLC admitted that "[w]ithout a quorum, the FEC is unable to 'launch any new investigations…or render any decisions in pending enforcement actions.'" *CLC v. FEC*, ECF No. 9 at 5 (quoting Ellen L. Weintraub, *The State of the Federal Election Comm'n* (Nov. 1, 2019), https://www.fec.gov/resources/cms-content/documents/2019-11-01-State-of-the-Commission-ELW.pdf.

Meanwhile, this Court and the *Heritage Action* court both recognized that "there is an open question on whether a court may find that an agency has unlawfully withheld action when the agency lacks quorum." *CLC v. FEC*, ECF No. 14 at 1 n.1 (citing *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 19 n.10 (2013)); *see also CLC v. FEC*, No. 21-cv-406, ECF No. 16, at 3 n.1 (Mar. 25, 2022) (Kelly, J.) (similar).

Here, even taking into account the periods when the FEC lacked a quorum, the delay between CLC's filing of its complaint and the FEC's January 26, 2021 action was only approximately 13 months. This length of delay can hardly be considered unreasonable under the circumstances, particularly given the lack of any emergency that would have necessitated quicker action. *See In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 n.12 (D.C. Cir. 2004) (collecting cases) (noting that the D.C. Circuit typically only finds three-year-plus delays unreasonable).

*       *       *

In sum, the FEC took diligent action on this matter given its lack of a quorum. It did not disclose the action on the matter because three commissioners refused to take the ministerial step to make that decision public and even refused to allow its counsel to enter an appearance in CLC's action against the FEC. Now, however, the decision is public, was subject to judicial review, and should be the basis for this Court to end the case. To adopt CLC's view of agency action would turn the four-vote requirement to advance to an investigation on its head and allow three commissioners to block release of what is a judicially-recognized deadlocked decision. The Court need not reach that thorny issue, since the FEC did act in this case and release the results of its deadlocked decision.

## **CONCLUSION**

CLC asserts that this Court has jurisdiction to continue to hear this case, but that the FEC lost jurisdiction over the matter, such that its (long concealed) decision on the merits of MUR No. 7674 should be disregarded. In reality, the reverse is true. The FEC never lost jurisdiction. By contrast, CLC's standing, and hence the Court's subject-matter jurisdiction, were based upon false pretenses from the beginning of this litigation. Moreover, even if CLC ever had proper standing, it is clear that the case is now moot—both as a matter of Article III and prudentially—in light of the FEC's decision on MUR No. 7674.

Accordingly, for the foregoing reasons and those stated in Iowa Values' Motion, Iowa Values respectfully requests that the Court grant Iowa Values' Motion and dismiss this case.


Dated: February 10, 2023                                     Respectfully submitted,

                                                             */s/ Vincent E. Verrocchio*
                                                             Ronald M. Jacobs
                                                             Phone: (202) 344-8215
                                                             Email: RMJacobs@Venable.com
                                                             Vincent E. Verrocchio
                                                             Phone: (202) 344-4496
                                                             Email: VEVerrocchio@Venable.com
                                                             VENABLE LLP
                                                             600 Massachusetts Avenue, NW
                                                             Washington, D.C. 20001

                                                             *Counsel for Iowa Values*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 10th day of February 2023, pursuant to the Court's January 25, 2023

notification regarding the unavailability of the Court's ECF system after 6:00 pm on February 10,

2023, I caused a copy of the foregoing to be filed via electronic mail with the Court at

dcd_cmecf@dcd.uscourts.gov and served upon all counsel of record authorized to receive notice

of such filing, including:

>Richard S. Grahm (DC Bar. No. 1500194)
>Molly E. Danahy (DC Bar No. 1643411)
>Erin Chlopak (DC Bar No. 496370)
>Campaign Legal Center
>1101 14th Street NW, Suite 400
>Washington, DC 20005
>(410) 829-8996
>agraham@campaignlegalcenter.org
>mdanahy@campaignlegalcenter.org
>echlopak@campaignlegalcenter.org
>
>*Counsel for Plaintiff*
>
>
>Lisa J. Stevenson (DC Bar No. 457628)
>Greg J. Mueller (DC Bar. No. 462840)
>Harry J. Summers
>Kevin Deeley
>FEDERAL ELECTION COMMISSION
>1050 First Street NE
>Washington, DC 20463
>(202) 694-1650
>lstevenson@fec.gov
>gmueller@fec.gov
>hsummers@fec.gov
>kdeeley@fec.gov
>
>*Counsel for FEC*
>
>                    /s/ *Vincent E. Verrocchio*
>                    Vincent E. Verrocchio

26

*Counsel for Iowa Values*